IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENGAL CONVERTING SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> LANDMARK AMERICAN INSURANCE CO., et al., <br><br> Defendants. | CIVIL ACTION <br> NO. 2:24-cv-3332 |

## OPINION

**Slomsky, J.**                                                                             **March 5, 2025**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 3

II.    BACKGROUND .................................................................................................. 4

   A.   **Factual Background** ....................................................................................... 4

      1.   Claim for Business Income and Extra Expense Coverage ........................... 7

      2.   Claim for Property Damage Coverage ........................................................ 7

      3.   Interpleader Action ..................................................................................... 9

   B.   **Procedural Background** ................................................................................. 12

III.   STANDARD OF REVIEW .................................................................................. 12

   A.   **Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)** ....................................................................................... 12

   B.   **Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)** ............................................................................................ 14

**IV.    ANALYSIS** ................................................................................................. 15

    **A.    Landmark's Motion to Dismiss Will Be Granted In Part and Denied In Part** ......... 15

        1.    Plaintiff's Declaratory Relief Claim Will Not Be Dismissed .................................... 15

        2.    Plaintiff's Common Law Bad Faith Claim Will Be Dismissed ................................. 17

        3.    Plaintiff's Statutory Bad Faith Claim Will Be Dismissed Without Prejudice ........... 18

            a.    Bad Faith Allegations Stemming from Plaintiff's Claim for Property Damage Coverage ............................................................................................ 21

            b.    Bad Faith Allegations Stemming from Plaintiff's Claim for Business Income and Extra Expense Coverage ..................................................................... 22

            c.    Bad Faith Allegations Stemming from Landmark's Handling of the Interpleader Action ................................................................................................. 23

            d.    Plaintiff's Remaining Bad Faith Allegations are Conclusory ................................. 24

    **B.    Landmark's Motion to Strike Will Be Denied as Moot** ............................................. 25

**V.    CONCLUSION** ......................................................................................... 26

## I.    INTRODUCTION

This case arises out of an insurance dispute stemming from a fire that occurred on Plaintiff Bengal Converting Services, Inc.'s ("Plaintiff" or "Bengal") premises.  (Doc. No. 1-3 at ¶ 1.) Plaintiff hired Defendants John Siracusa, Insurance Agencies, Inc., and Siracusa-Kaufmann Insurance Agency, LLC (the "Siracusa Defendants") as its insurance agent and broker to secure insurance coverage for the protection of Plaintiff's business operations.  (Id. at ¶ 12.)  Thereafter, the Siracusa Defendants secured coverage for Plaintiff under a commercial property insurance policy (the "Landmark Policy" or "Policy") with Defendant Landmark American Insurance Company ("Landmark").  (Id. at ¶ 13.)

Included under this policy was coverage for business income with extra expense, including "rental value" as well as coverage for property damage.[1]  (Id. at ¶ 21.)  However, in the most recent renewal of the Landmark Policy, the Siracusa Defendants listed $0.00 for business income and extra expense coverage on the Policy's Statement of Values which, according to the terms of the Policy, effectively canceled the business income coverage under the Policy.  (Id. at ¶ 58.)  As such, when Plaintiff submitted a claim to Landmark for the lost business income and extra expenses it incurred as a result of the fire, Landmark denied the claim.  (Id. at ¶ 82.)  Plaintiff also submitted a claim for property damage, but is not satisfied with the amount Landmark has paid toward the claim.  (Id. at ¶¶ 89, 94.)

---

[1]  The Landmark Policy defines "business income" as "Net Income (Net Profit of Loss before income taxes) that would have been earned or incurred" and "Continuing normal operating expenses incurred, including payroll."  (Doc. No. 1-3 at ¶ 27.)  It further defines "extra expenses" as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct . . . damage to property caused by or resulting from a Covered Cause of Loss."  (Id. at ¶ 28.)

As a result, in June 2024, Plaintiff brought the instant suit.[2]  (See Doc. No. 1.)  Plaintiff brings the following claims against the Siracusa Defendants and Landmark (collectively, "Defendants"):  (1) declaratory relief for the business income and extra expense coverage against Landmark (Count I); (2) breach of contract against Landmark (Count II); (3) negligence against the Siracusa Defendants (Count III); (4) breach of contract/common law bad faith against Landmark (Count IV); and (5) statutory bad faith under 42 Pa. Cons. Stat. § 8371 against Landmark (Count V).  (See Doc. No. 1-3.)  On August 1, 2024, Landmark filed a Motion to Dismiss and Strike the Complaint, seeking to dismiss Plaintiff's claims for declaratory relief, common law bad faith, and statutory bad faith as well as to strike averments of Landmark owing Plaintiff a fiduciary duty.  (See Doc. No. 7.)  Landmark does not move to dismiss the breach of contract claim against it.  (See id.)  For reasons that follow, Landmark's Motion to Dismiss the Complaint (Doc. No. 7) will be granted in part and denied in part and its Motion to Strike the Complaint will be denied as moot.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff is a full-service paper converting and distribution company that leases a large industrial building designed to house the manufacturing, warehousing, and production operations for its business.[3]  (Doc. No. 1-3 at ¶¶ 31-32.)  It hired the Siracusa Defendants to act as its insurance

---

[2]  Prior to Plaintiff initiating the instant suit, Landmark had filed an interpleader action captioned Landmark American Insurance Company v. Bengal Converting Services, Inc., Envista Forensic Services, LLC d/b/a AREPA, Links Debt Fund, LLC, The Victory Bank, and Clark & Cohen, P.C., Case No. 2:23-cv-02576.  (Doc. No. 1-3 at ¶ 128.)  The interpleader action is discussed in more detail below.

[3]  Plaintiff owned the building from June 2010 until January 2022 when it sold the building to a third party.  (See Doc. No. 1-3 at ¶¶ 18-19.)  After Plaintiff sold the building, it continued to lease and occupy the premises for its business operations.  (Id.)

agent and broker and secure insurance coverage for Plaintiff's business. (Id. at ¶ 35.) Beginning in March 2020, the Siracusa Defendants obtained and secured the Landmark Policy on behalf of Plaintiff. (Id. at ¶ 45.) This Policy provided for the following coverages: (1) building, (2) machinery and equipment, (3) personal property of others, and (4) business income with extra expense, including "rental value." (Id. at ¶ 21.)

The initial term under the Landmark Policy began March 5, 2020 and ended March 5, 2021. (Id. at ¶ 14.) Thereafter, Plaintiff, through the Siracusa Defendants, renewed the Landmark Policy for the March 5, 2021 to March 5, 2022 term and again for the March 5, 2022 to March 5, 2023 term. (Id. at ¶ 15.) When the Policy was being renewed for the March 5, 2022 to March 5, 2023 term, Landmark provided Plaintiff an insurance proposal/quote for commercial property insurance which included "Business Income with Extra Expense including 'Rental Value'" on its list of coverage provided under the Policy. (Id. at ¶ 55.) And once the Landmark Policy was renewed for this term, Landmark identified on the Declarations Page of the Policy the coverages provided for under the Policy, including business income and extra expense coverage. (Id. at ¶ 67.)

However, unbeknownst to Plaintiff, when the Siracusa Defendants renewed the Landmark Policy for the March 5, 2022 to March 5, 2023 term, they "effectively cancel[ed] the business income and extra expense coverage [Plaintiff] thought it had" by noting $0.00 for Business Income on the Statement of Insurable Values. (Id. at ¶ 58.)

Under the terms of the Landmark Policy, coverage for business income and extra expense is subject to the conditions of the Scheduled Limit of Liability, which states in pertinent part as follows:

> It is understood and agreed that the following special terms and conditions apply to this policy:
>
>   1. In the event of loss hereunder, liability of the Company shall be limited to

the least of the following liability limitation measures in any one "occurrence":

>a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits; or

>b. 100% of the individually stated value for each scheduled item of coverage insured at the location which had the loss <u>as shown on the latest Statement of Values on file with this Company</u>, less applicable deductibles and primary and underlying excess limits; or

>c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy, if, after the application of the limits in a. or b. above to each scheduled item of coverage which had the loss, the total exceeds such Limit of Liability

<u>If no value is shown for a scheduled item then there is no coverage for that item.</u> Where the loss or "occurrence" involves more than one insured location or scheduled item of coverage, the liability of the Company for each individually scheduled item of coverage shall be measured separately and on a per scheduled item basis. Nothing herein requires the Company to utilize the same liability limitation measure for all insured scheduled items or insured locations involved in any one "occurrence". The liability limitation measure to be used by the Company shall be the measure providing the least amount of coverage for each scheduled item individually. The Company may have no liability after applying the liability limitation measures, applicable deductibles and primary and underlying excess limits.

(<u>Id.</u> at ¶ 60 (emphasis added).)  In other words, under the Policy, Landmark's liability to Plaintiff for business income and extra expense coverage was limited to the least of the liability measures listed on the Scheduled Limit of Liability.  And under section 1(b) of the Schedule, reproduced above, one of the liability measures listed is the amount of loss "shown on the latest Statement of Values."  (<u>See</u> <u>id.</u>)  But when the Siracusa Defendants renewed the Landmark Policy for the March 5, 2022 to March 5, 2023 term, they put $0.00 on the Statement of Values for business income and extra expense.  As such, there was no value shown for business income and extra expense coverage, meaning Plaintiff had no coverage for business income and extra expense.  (<u>See</u> <u>id.</u> ("If no value is shown for a scheduled item then there is no coverage for that item."))

On July 9, 2022, there was a fire at the building that Plaintiff leases, resulting in substantial damage to the building, machines and equipment, business personal property, and Plaintiff's paper product and supplies.  (Id. at ¶ 84.)  On July 11, 2022, Plaintiff retained Clarke & Cohen, P.C. to advise and assist Plaintiff in the adjustment of the insurance claim arising from the fire.  (Id. at ¶ 90.)  On the same day, Plaintiff also hired AREPA to provide emergency remediation services, including decontamination of the damaged paper converting machines and equipment.  (Id. at ¶ 91.) As a result of the damage Plaintiff sustained in the fire, Plaintiff submitted claims to Landmark to recover under the Landmark Policy's business income and extra expense coverage and property damage coverage.  (See id. at ¶¶ 49, 96.)

### 1.    Claim for Business Income and Extra Expense Coverage

The fire forced Plaintiff to completely suspend its business operations, causing Plaintiff to suffer a loss of business income.  (Id. at ¶ 47.)  As a result, Plaintiff, believing itself fully insured for all the resulting damage, submitted a claim to Landmark to recover coverage for, among other things, its loss of business income and for the extra expenses incurred.  (Id. at ¶ 49.)  But because Plaintiff's business income and extra expense coverage under the Landmark Policy had effectively been canceled by the Siracusa Defendants, when Plaintiff submitted a claim for this coverage, Landmark denied the claim.  (Id. at ¶ 80.)  In denying the claim, Landmark directed Plaintiff to the Scheduled Limit of Liability form, reproduced in part above, which stated that Landmark's liability for business income and extra expense coverage under the policy was $0.00.  (See id.)

### 2.    Claim for Property Damage Coverage

As noted above, the Landmark Policy also covered property damage.  (Id. at ¶ 21.)  When Plaintiff submitted a claim to Landmark for its property damage resulting from the July 9, 2022 fire, Landmark assigned the claim to Engle Martin, an adjusting firm retained by Landmark to investigate the fire loss.  (Id. at ¶ 96.)  On July 12, 2022, Engle Martin sent a representative to

Plaintiff's building to inspect the damage. (Id. at ¶ 98.) Landmark retained TechLoss Consulting & Restoration, Inc. ("TechLoss") to inspect the damage to Plaintiff's paper converting machines and equipment. (Id. at ¶ 99.) On July 13, 2022, TechLoss sent a representative to Plaintiff's building to inspect the damage. (Id. at ¶ 100.)

In order to receive payment from Landmark for damage coverage, the Policy requires Plaintiff to, among other duties, send Landmark "a signed, sworn proof of loss." (Id. at 278.) On July 28, 2022, Plaintiff submitted to Landmark its first Sworn Statement in Partial Proof of Loss, claiming $250,000 in partial payment related to the loss and damage Plaintiff sustained in the fire. (Id. at ¶ 102.) On July 29, 2022, Landmark issued a check in the amount of $250,000 made payable to Plaintiff, Links Debtfund LLC, and The Victory Bank, noting the check was in payment for "Advance Fire Damage 7/9/2022." (Id. at ¶ 103.) Following this payment, Plaintiff submitted to Landmark documentation to establish the value of its claim. (Id. at ¶ 106.) Included in this documentation was a report detailing the damage from the fire and reporting that the estimated cost to repair and replace the damaged machines and equipment was $1,612,736. (Id. at ¶ 109.) After Landmark received this documentation, Engle Martin communicated with Plaintiff by letter, requesting additional documentation for review. (Id. at ¶ 111-12.) In response, Plaintiff cited to the documentation it had previously provided. (Id. at ¶ 114.) This response also reported that the estimated cost to repair and replace the damaged machines and equipment had increased to $2,953,374.22. (Id. at ¶ 115.)

On February 1, 2023, Plaintiff submitted a second Sworn Statement in Partial Proof of Loss to Landmark, claiming $275,000 in partial payment related to the loss and damages sustained by Plaintiff in the fire. (Id. at ¶ 116.) On February 2, 2023, Landmark issued a check in the amount of $275,000 made payable to Plaintiff, Links Debtfund, LLC, and The Victory Bank. (Id. at ¶ 117.)

On the check, Landmark noted that the payment was for "BPP + 2nd Advance = Per Signed Proof of Loss."[4] (<u>Id.</u>) Following this payment, Landmark retained JS Held to assist with its investigation and evaluation of Plaintiff's claim and, on February 9, 2023, JS Held inspected the building and the property damage. (<u>Id.</u> at ¶ 120.) On February 10, 2023, JS Held issued a Request for Information to Plaintiff and, in response, Plaintiff provided the requested information. (<u>Id.</u> at ¶ 122-23.)

In early June 2023, Plaintiff submitted a third Sworn Statement in Partial Proof of Loss to Landmark, seeking another $309,338 in partial payment related to the loss and damage sustained by Plaintiff in the fire. (<u>Id.</u> at ¶ 124.) On June 9, 2023, Landmark issued a check in the amount of $309,338 to Bengal, AREPA, Links Debt Fund, LLC, The Victory Bank, and Cohen & Clark, P.C., noting the payment was for "Additional BPP 7/9/2022." (<u>Id.</u> at ¶ 125.) After Plaintiff received this payment, Landmark has refused to issue any further payments "despite being provided with evidence and documentation establishing Bengal's claim exceeded the policy limits of coverage." (<u>Id.</u> at ¶ 126.)

### 3.    Interpleader Action

Following Landmark's issuance of the June 9, 2023 check, a dispute arose between Plaintiff and the other entities identified on the check concerning who was entitled to the insurance proceeds. (<u>Id.</u> at ¶ 127.) To resolve this dispute, Landmark instituted an interpleader action in this Court (the "Interpleader Action"), seeking to determine which of the entities named on the check was entitled to the $309,338. (<u>Id.</u> at ¶ 129.) The Interpleader Action was captioned <u>Landmark American Insurance Company v. Bengal Converting Services, Inc., Envista Forensic Services, LLC d/b/a AREPA, Links Debt Fund, LLC, The Victory Bank, and Clark & Cohen, P.C.</u>, Case No.

---

[4]   What "BPP" stands for is not explained by the parties. It is not relevant, however, to the Motion to Dismiss.

2:23-cv-02576, and randomly assigned to this Court. (Id. at ¶ 128.) The Court will take judicial

notice of the Interpleader Action's docket and its entries. See FCS Capital LLC v. Thomas, 579 F.

Supp. 3d 635, 647 (E.D. Pa. 2022) ("[C]ourts are also permitted to take judicial notice of docket

entries filed in separate litigation proceedings.")

The Interpleader Action was initiated by Landmark by the filing of a Complaint in the

Eastern District of Pennsylvania on July 6, 2023. See Landmark Am. Ins. Co. v. Bengal Converting

Services, Inc., et al., Case No. 2:23-cv-02576 [hereinafter Interpleader Docket], Doc. No. 1. In

the Complaint, Landmark requested that the Court "accept the interplead funds of $309,338 and

release Landmark from further obligations to any parties legally entitled to be named as payees on

the payment draft for the June 7, 2023 Sworn Statement in Partial Proof of Loss in the amount of

$309,338." Id. at 7. Landmark also sought a judgment discharging it "from further liability under

the Landmark Policy" for the fire loss. Id. at 9.

On July 28, 2023, Landmark filed a Motion for the Deposit of Funds, in which it requested

that the Court allow it to deposit $309,338, the amount in dispute in the Interpleader Action. See

Interpleader Docket, Doc. No. 9. On September 8, 2023, the Court granted Landmark's Motion

and on September 18, 2023, Landmark deposited $309,338 into the Registry of the Court. See

Interpleader Docket, Doc. No. 15.

On May 30, 2024, Landmark's counsel filed a letter informing the Court that it had

determined, based on documentation from one of the Interpleader Action defendants, that an

additional $88,469 should be deposited in the Registry of the Court. See Interpleader Docket, Doc.

No. 49. The letter also advised the Court that it had circulated among the parties a joint consent

motion to allow Landmark to deposit the additional $88,469. Id. And while the letter notes that

the parties did not challenge the deposit of the addition of funds, it specifies that "Bengal sought

10

substantial changes to this Proposed Joint Motion, particularly seeking [the] deletion of language [stating] 'that this action and all claims made, or that could be made, between all parties concerning the Loss, all insurance proceeds related to the Loss and the Policy concerning this Loss be dismissed with prejudice.'" Id. On May 31, 2024, counsel for Bengal filed a letter in response to Landmark's letter, emphasizing that Bengal did not agree to discharge Landmark from liability for all claims that Bengal might have against it relating to the fire loss. See Interpleader Docket, Doc. No. 50.

On September 23, 2024, all parties to the Interpleader Action filed a Consent Motion, agreeing to resolve the Interpleader Action based on the following terms:

1. The entire amount of the Interpleaded Insurance Proceeds (being $309,338.00) deposited into this Court's registry on September 18, 2023, and all accrued interest on the Interpleaded Insurance Proceeds, shall be released from this Court's Registry to Defendant Envista Forensics, LLC d/b/a AREPA ("AREPA");

2. By agreement of the parties, Landmark American Insurance Company shall be permitted to distribute additional adjusted insurance proceeds for AREPA's Loss-related services (being $88,469.47) to AREPA directly (with the Interpleaded Insurance Proceeds, the "Total Remaining AREPA Insurance Proceeds");

3. The Defendants shall not pursue any claims, rights, causes of actions or demand of whatever nature under the pertinent Landmark American Insurance Company Policy against Landmark American Insurance Company, its parents, subsidiaries, affiliates, insurers, re-insurers, directors, officers, employees. agents, representatives, attorneys and their respective heirs, executors, administrators, successors and assigns for payment of any monies, in the amount of $397,807.47 paid by the Landmark American Insurance Company to or on behalf of Bengal Converting Services, Inc. to AREPA pursuant to the agreement of the parties.

4. Any remaining dispute(s) between Landmark American Insurance Company and Bengal Converting Services, Inc., may be litigated in a separate action, Bengal Converting Services, Inc. v. Landmark American Insurance Company et al., E.D. Pa. 2:24-cv-03332-JHS, as discussed in paragraph five, six, and seven of the parties' joint motion for consent order; and

5. Upon distribution of the Total Remaining AREPA Insurance Proceeds to AREPA, all parties consent to have this action dismissed with each party to bear its own costs and expenses.

See <u>Interpleader Docket</u>, Doc. No. 66.  On September 25, 2024, the Court granted the Consent Motion.  <u>See</u> <u>Interpleader Docket</u>, Doc. No. 67.  Finally, on November 7, 2024, in light of the parties' settlement, the Court entered an Order dismissing the Interpleader Action.  <u>See</u> <u>Interpleader Docket</u>, Doc. No. 70.

### B.    Procedural Background

On June 25, 2024, Plaintiff filed a Complaint against Defendants in the Court of Common Pleas of Philadelphia County, Pennsylvania.  (Doc. No. 1 at 1.)  On July 25, 2024, Defendants removed the case to the United States District Court for the Eastern District of Pennsylvania.  (<u>See</u> <u>id.</u>)  On August 1, 2024, the Siracusa Defendants filed an Answer to the Complaint.  (Doc. No. 6.)  Also on August 1, 2024, in lieu of filing an Answer, Landmark filed a Motion to Dismiss and Strike the Complaint.  (Doc. No. 7.)  As noted above, in this Motion, Landmark seeks dismissal of Plaintiff's claims for declaratory relief, common law bad faith, and statutory bad faith as well as to strike averments of it owing Plaintiff a fiduciary duty.  (<u>See</u> <u>id.</u>)  Landmark does not, however, move to dismiss Plaintiff's breach of contract claim against it.  (<u>See</u> <u>id.</u>)

On August 15, 2024, Plaintiff filed a Response in Opposition to Landmark's Motion.  (Doc. No. 8.)  On February 24, 2025, the Court held a hearing on the Motion at which counsel for Plaintiff and Defendants were present.  Landmark's Motion to Dismiss and Strike the Complaint (Doc. No. 7) is now ripe for disposition.

## III.    STANDARD OF REVIEW

### A.    Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  After <u>Iqbal</u> it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Iqbal, 556 U.S. at 678).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts:  "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

A complaint can also be dismissed under Federal Rule of Civil Procedure 12(b)(6) if a plaintiff has not pled any legally cognizable claims for declaratory relief. Ridge v. Campbell, 984 F. Supp. 2d 364, 374 (M.D. Pa. 2013). The Declaratory Judgment Act provides that:

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C.A. § 2201(a). "In determining the appropriateness of declaratory relief, the court must consider whether such relief will resolve an uncertainty giving rise to a controversy, the convenience of the parties, the public interest, and the availability of other remedies." Ridge, 984 F. Supp. 2d at 373–74.

### B. Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)

Pursuant to Federal Rule of Civil Procedure 12(f), upon a motion by either party, the "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a Rule 12(f) motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012). A matter is immaterial if it has no essential or important relationship to the claim for relief. Nelson v. Bender, No. 3:15-64, 2015 U.S. Dist. LEXIS 163619, at *11 (W.D. Pa. Dec. 7, 2015). Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), "striking a pleading is a 'drastic

remedy' to be used sparingly because of the difficulty of deciding a case without a factual record." BJ Energy LLC v. PJM Interconnection, LLC, Nos. 08-3649 & 09-2864, 2010 U.S. Dist. LEXIS 36969, at *5 (E.D. Pa. Apr. 13, 2010).

## IV.    ANALYSIS

### A.    Landmark's Motion to Dismiss Will Be Granted In Part and Denied In Part

As discussed above, in its Motion to Dismiss the Complaint, Landmark moves to dismiss Plaintiff's claims for declaratory relief (Count I), common law bad faith (Count IV), and statutory bad faith (Count V).  (See Doc. No. 7.)  The Court will address each claim in turn.

### 1.    Plaintiff's Declaratory Relief Claim Will Not Be Dismissed

In Count I, Plaintiff requests that the Court grant it declaratory relief by reforming the Landmark Policy "to include business income and extra expense coverage thereby requiring Landmark to pay Bengal for its loss of income and extra expense incurred as a result of the July 9, 2022 fire loss."  (Doc. No. 1-3 at ¶ 164.)  Plaintiff premises this claim for declaratory relief on the reasonable expectations doctrine.  (See id. at ¶ 163.)

"The Pennsylvania doctrine of reasonable expectations states that '[t]he reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents."  UPMC Health Sys. v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004) (quoting Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1353 (Pa. 1978)) (alterations in original).  This doctrine "is intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy."  Id.  In ascertaining the reasonable expectations of the insured, courts should examine "the totality of the insurance transaction involved . . . with

an emphasis on the express terms of the written insurance policy." Regis Ins. Co. v. All Am. Rathskeller, Inc., 976 A.2d 1157, 1166 (Pa. Super. 2009).

When applying the doctrine of reasonable expectations, Pennsylvania courts have generally granted relief only where the terms of the insurance policy at issue are ambiguous. See Matcon Diamond, Inc. v. Penn Nat. Ins. Co., 815 A.2d 1109, 1114 (Pa. Super. Ct. 2003) ("[G]enerally, courts cannot invoke the reasonable expectation doctrine to create an ambiguity where the policy itself is unambiguous.") Courts have, however, created two limited exceptions to this general rule, applying the doctrine to cases involving unambiguous policies in order to protect (1) "non-commercial insureds from policy terms which are not readily apparent;" and (2) "non-commercial insureds from deception by insurance agents." Id. And while the question of whether the doctrine can be applied to commercial insureds does not appear to have been addressed yet by Pennsylvania courts, the Third Circuit Court of Appeals "predicted that Pennsylvania courts would apply [the] doctrine even where the insured is a sophisticated purchaser of insurance—i.e. 'a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance.'" UPMC Health Sys., 391 F.3d at 502 (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904 n.8 (3d Cir. 1997)).

Here, Landmark argues that Plaintiff's reliance on the doctrine of reasonable expectations is misplaced because the doctrine only protects non-commercial insureds. (Doc. No. 7 at 7.) In other words, because Plaintiff is a commercial insured, Landmark argues that the doctrine of reasonable expectations does not apply. (See id.) But, as noted above, the Third Circuit has predicted that Pennsylvania courts would extend the doctrine to sophisticated commercial entities. See UPMC Health Sys., 391 F.3d at 502. And this Court is bound by the decision of the Third

Circuit. Thus, under current case law, the doctrine of reasonable expectations may be applied in the instant case.

That said, the issue of whether Plaintiff reasonably expected the Landmark Policy to include business income and extra expense coverage is best left for after discovery, when the parties have had the opportunity to further develop the facts of the case. See UPMC Health Sys., 391 F.3d at 502 (considering the merits of a request for declaratory relief under the doctrine of reasonable expectations on a motion for summary judgment); Liberty Mutual Ins. Co. v. Treesdale Inc., 418 F.3d 330, 344 (3d Cir. 2005) (same); Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 439-40 (3d Cir. 2006) (same); Whole Enchilada, Inc. v. Travelers Property Cas. Co. of Am., 581 F. Supp. 2d 677, 693-94 (W.D. Pa. 2008) (same); Downey v. First Indem. Ins., et al., 214 F. Supp. 3d 414, 423-27 (E.D. Pa. 2016) (same). Accordingly, Landmark's Motion to Dismiss the Complaint (Doc. No. 7) will be denied as to Plaintiff's claim for declaratory relief (Count I).

### 2.    Plaintiff's Common Law Bad Faith Claim Will Be Dismissed

In Count IV, Plaintiff brings a common law bad faith claim against Landmark, alleging Landmark "has duties of good faith and fair dealing with respect to its insured" and that it breached these duties "in connection with their dealings" with Plaintiff. (Doc. No. 1-3 at ¶¶ 218-19.) In Pennsylvania, a claim for common law bad faith is "a claim sounding in contract." Birth Ctr. v. St. Paul Cos., Inc., 787 A.2d 376, 396 (Pa. 2001). As a result, in cases where a plaintiff asserts claims for both breach of an insurance contract and common law bad faith, courts routinely hold that "the common law bad faith claim is subsumed into the breach of contract claim." McDonough v. State Farm Fire & Cas. Co., 365 F. Supp. 3d 552, 558 (E.D. Pa. 2019); see also Cummings v. Allstate Ins. Co., 832 F. Supp. 2d 469, 472 (E.D. Pa. 2011) (finding "that Pennsylvania does not allow an independent cause of action for a breach of the implied duty to act in good faith" in addition to a breach of contract claim); Pommells v. State Farm Ins., No. 18-5143, 2019 WL

2339992, at *6 (E.D. Pa. June 3, 2019) ("With respect to a breach of contract action, Pennsylvania courts have held that 'the common law duty of good faith and fair dealing is implied in every contract.' . . . Operating from that premise, courts have consistently concluded that a plaintiff cannot bring a freestanding common law bad faith claim and a separate breach of contract claim, as the former is subsumed within the latter.")

Here, because Plaintiff alleges both a breach of an insurance contract claim and a common law bad faith claim against Landmark, the common law bad faith claim will be dismissed. In Count II, Plaintiff brings a breach of contract claim against Landmark for its refusal "to make payment under the Landmark Policy to [Plaintiff] of the monies to which they are entitled." (Doc. No. 1-3 at ¶ 171.) Then, in Count IV, Plaintiff brings a breach of contract common law bad faith claim against Landmark, alleging Landmark breached its duty of good faith and fair dealing owed to Plaintiff. (Id. at ¶ 219.) But because Pennsylvania does not recognize separate claims for breach of an insurance contract and common law bad faith, Landmark's Motion to Dismiss the Complaint (Doc. No. 7) will be granted as to Plaintiff's common law bad faith claim (Count IV).

### 3.    Plaintiff's Statutory Bad Faith Claim Will Be Dismissed Without Prejudice

In Count V, Plaintiff brings a statutory bad faith claim against Landmark under Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371. This statute provides as follows:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured the court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONST. STAT. § 8371.  While the statute does not define "bad faith," the Pennsylvania Superior Court has defined it as "any frivolous or unfounded refusal to pay the proceeds of a policy."  Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Bad Faith, Black's Law Dictionary (6th ed. 1990)).

The bad faith standard requires an insured to prove with clear and convincing evidence that "(1) the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis."  Klinger v. State Farm Mut. Auto Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997).  Bad faith claims are fact specific and turn on the conduct of the insurer toward the insured.  Dougherty v. Allstate Prop. And Cas. Ins. Co., 185 F. Supp. 3d 585, 598 (E.D. Pa. 2016).  Because bad faith claims are fact specific, to survive a motion to dismiss "a plaintiff must plead specific facts as evidence of bad faith and cannot rely on conclusory statements."  Toner v. GEICO Ins. Co., 262 F. Supp. 3d 200, 208 (E.D. Pa. 2017) (citing Smith v. State Farm Mut. Auto. Ins. Co., 506 F. App'x 133, 136 (3d Cir. 2012)).  To that end, "[a] plaintiff cannot merely say that an insurer acted unfairly, but instead must describe with specificity what was unfair."  Id.

Applying this standard, courts in the Third Circuit regularly dismiss bad faith claims when the complaint lacks specific factual details and consist only of "lists of conclusions—not facts." Brown v. LM Gen. Ins., No. 21-2134, 2021 WL 3809075, at *2 (E.D. Pa. Aug. 26, 2021); see also Smith v. State Farm Mut. Auto. Ins. Co., 506 F. App'x 133, 136 (3d Cir. 2012) ("The complaint consists of conclusory statements unsupported by facts—State Farm, e.g., 'breach[ed] covenants of good faith and fair dealing,' and 'engag[ed] in unfair settlement negotiations.' There are no details describing what was unfair about the negotiations."); Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 600 (E.D. Pa. 2010) ("[I]n this case, [the] plaintiff presents 'bare-

19

bones' conclusory allegations which do not state a plausible bad faith claim. [The] [p]laintiff provides no factual support from which I can conclude that [the] defendant's actions in investigating and evaluating [the] plaintiff's claim were unreasonable.") Courts will also dismiss bad faith claims when the plaintiff's allegations of bad faith are "plainly contradicted by the facts of the case." Smith, 506 F. App'x at 136.

Here, Plaintiff's allegations of bad faith are numerous. (See Doc. No. 1-3 at ¶ 230.) They are found in sections (a) through (z) in paragraph 230 of the Complaint. (See id.) Specifically, Plaintiff alleges the following bad faith actions:

(a) engaging in unfair deceptive practices;
(b) failing to fully, fairly and promptly evaluate the claims of Bengal;
(c) unreasonably delaying payment to Bengal;
(d) refusing to make payment of property loss, business income and extra expense in connection with the losses and damages sustained by Bengal;
(e) failing to continue to fully, fairly and promptly evaluate the claims of Bengal as additional information was developed and submitted;
(f) failing to effectuate a prompt and fair settlement of the claims of Bengal;
(g) forcing Bengal to institute suit to recover benefits due and owing to Bengal under the Landmark Policy;
(h) failing to comply with the terms and provisions of the Insuring Agreement of the Landmark Policy;
(i) breaching the implied covenant of good faith and fair dealing;
(j) accepting premiums for coverages while, at the same time, refusing to pay reasonable and fair damages to Bengal in connection with losses sustained;
(k) violating the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et seq.;
(l) acting in a dilatory and obdurate manner in the handling of the claims of Bengal;
(m) forcing Bengal to incur fees, costs and expenses in pursing litigation and forcing them to institute suit in order to recover monies due and owing to them under the Landmark policy;
(n) wantonly and willfully disregarding the rights of Bengal;
(o) ignoring the additional information submitted by Bengal which confirmed the compensability of the claim;
(p) refusing to reconsider its coverage position upon receipt of additional information and documentation from Bengal;
(q) refusing to pay undisputed insurance proceeds;
(r) requiring Bengal to release Landmark of its obligations and duties under the Landmark Policy in exchange for payment of undisputed insurance proceeds;

(s)  improperly seeking to extinguish its obligations and duties under the Landmark Policy to Bengal in an Interpleader Action;

(t)  elevating its own interests above those of Bengal;

(u)  acting in bad faith in the handling of the claims of Bengal;

(v)  breaching the fiduciary duties owed to Bengal under the Landmark Policy;

(w) violating the Unfair Claims Settlement Practices, 31 Pa. Code § 146.1 et seq.;

(x)  violating statutes and regulations in the Commonwealth of Pennsylvania governing insurers;

(y)  violating its own internal policies, procedures, practices and guidelines for handling of claims; and

(z)  such other acts or omissions as may be developed during discovery.

(Id.)  These allegations can be grouped into three main categories:  (1) allegations stemming from Landmark's handling of Plaintiff's claim for property damage coverage; (2) allegations stemming from Landmark's handling of Plaintiff's claim for business income and extra expense coverage; and (3) allegations stemming from Landmark's handling of the Interpleader Action.  (See id.)  The Court will address each of the three categories in turn.

### a.  Bad Faith Allegations Stemming from Plaintiff's Claim for Property Damage Coverage

First, regarding the allegations stemming from Landmark's handling of Plaintiff's claim for property damage coverage, these allegations cannot support a claim for statutory bad faith because they are contradicted by the facts in the Complaint.  For example, among other allegations, Plaintiff claims that Landmark "fail[ed] to fully, fairly and promptly evaluate the claims of Bengal," "unreasonably delay[ed] payment to Bengal," and "fail[ed] to effectuate a prompt and fair settlement of the claims of Bengal."  (See id. at ¶ 230 (b)-(c), (f).)  But in the Complaint, Plaintiff alleges that, upon receipt of Plaintiff's claim, Landmark began its investigation into the claim by hiring Engle Martin, an adjusting firm retained by Landmark to investigate Plaintiff's loss, as well as TechLoss "to inspect the damages to the paper converting machines and equipment."  (Id. at ¶¶ 96, 99.)  The Complaint reports that both Engle Martin and TechLoss inspected Plaintiff's building, machinery, equipment, business personal property, and paper

product and supplies within days of the July 9, 2022 fire.  (Id. at ¶¶ 98, 100.)  The Complaint further details how Plaintiff submitted three Sworn Statements in Partial Proof of Loss to Landmark, and how, within a day of receiving these statements, Landmark issued checks to Plaintiff for the full amounts requested in the statements.  (Id. at ¶¶ 102-03, 116-17, 124-25.)

Because the Complaint details Landmark's prompt investigation of and payment towards Plaintiff's claim, Plaintiff's bad faith allegations regarding Landmark's handling of Plaintiff's claim for property damage coverage seem to instead be based on Landmark not paying the full amount that Plaintiff asserts its claim is worth.  (See id. at ¶ 119.)  But a dispute between an insured and insurer over the value of a claim is not unusual and does not amount to bad faith on the part of the insurer.  See Smith, 506 F. App'x at 137 ("[T]he failure to immediately accede to a demand for the policy limit cannot, without more, amount to bad faith."); see also Johnson v. Progressive Ins. Co., 987 A.2d 781, 785 (Pa. Super. Ct. 2009) ("The underlying facts involve nothing more than a normal dispute between an insured and insurer over the value of an [underinsured motorist] claim. The scenario under consideration occurs routinely in the processing of an insurance claim.")

**b.    Bad Faith Allegations Stemming from Plaintiff's Claim
for Business Income and Extra Expense Coverage**

Next, regarding the allegations stemming from Landmark's handling of Plaintiff's claim for business income and extra expense coverage, these allegations cannot support a claim for statutory bad faith because Plaintiff does not show that Landmark lacked a reasonable basis for denying Plaintiff's claim for this coverage.  Plaintiff alleges as evidence of bad faith that Landmark "refus[ed] to make payment of . . . business income and extra expense in connection with the losses and damages sustained by Bengal."  (Doc. No. 1-3 at ¶ 230 (d).)  But in the Complaint, Plaintiff explains that, while the Landmark Policy did extend coverage to Plaintiff for business income and extra expense, the Siracusa Defendants effectively canceled this coverage when they stated $0.00

for business income and extra expense coverage on the Policy's Statement of Values. (See id. at ¶ 62.) So in reading the allegations in the Complaint in the light most favorable to Plaintiff, because under the language of the Landmark Policy this coverage was canceled by the Siracusa Defendants, acting as Plaintiff's insurance agent and broker, Landmark had a reasonable basis for denying Plaintiff's claim for business income and extra expense coverage. And Plaintiff itself seems to acknowledge that Landmark had a reasonable basis for denying this claim, pleading in the Complaint that "[a]s a result of [the Siracusa Defendants] stating $0.00 on Statement of Insurable Values for Business Income without Bengal's knowledge or authority, Landmark denied Bengal's claim for business income and extra expense coverage." (Id. at ¶ 81.)

### c.    Bad Faith Allegations Stemming from Landmark's Handling of the Interpleader Action

Third, regarding the allegations stemming from Landmark's handling of the Interpleader Action, these allegations cannot support a claim for statutory bad faith because, at this stage of the litigation, they are contradicted by the public record and, further, Plaintiff has not plausibly alleged that Landmark's actions in handling the Interpleader Action were done in bad faith.[5] While Plaintiff alleges Landmark engaged in bad faith by "refusing to pay undisputed insurance proceeds," this allegation is contradicted by the Interpleader Action's docket. (Id. at ¶ 230 (q).) The docket in that action makes clear that Landmark did not refuse to pay the undisputed proceeds but instead deposited them into the Registry of the Court pending the determination as to which party to the Interpleader Action was entitled to the proceeds. See Interpleader Docket, Doc. Nos. 9, 15.

---

[5]    As explained above, the Court will take judicial notice of the Interpleader Action's docket and its entries. See FCS Capital LLC v. Thomas, 579 F. Supp. 3d 635, 647 (E.D. Pa. 2022) ("[C]ourts are also permitted to take judicial notice of docket entries filed in separate litigation proceedings.")

Next, Plaintiff's claims that Landmark acted in bad faith by "requiring Bengal to release Landmark of its obligations and duties under the Landmark Policy in exchange for payment of undisputed insurance proceeds," and "improperly seeking to extinguish its obligations and duties under the Landmark Policy to Bengal in an Interpleader Action" are not evidence of bad faith. (Doc. No. 1-3 at ¶¶ 230 (r)-(s).)   Courts considering similar facts have held that "it is not inappropriate for an insurance company to attempt to resolve all claims with one settlement, particularly when there is no indication of an attempt to mislead."  Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 593 (E.D. Pa. 1999); see also Palucis v. Continental Ins. Co., No. 98-356, 1998 WL 474108, at **2-3 (E.D. Pa. July 16, 1998) (dismissing bad faith claim and holding that the insurance company seeking a release of liability for all claims arising under the insurance policy was appropriate); Leab v. Cincinnati Ins. Co., No. 95-5690, 1997 WL 360903, at **5-7 (E.D. Pa. June 26, 1997) (holding that the insurance company seeking release of claims was appropriate as long as the company did not know or recklessly disregard its lack of a reasonable basis for requesting release).  Because Landmark did not attempt to mislead Plaintiff about its desire to be released from liability for all claims that Plaintiff might have against it relating to the fire loss, it did not act in bad faith by attempting to obtain such a release.

### d.    Plaintiff's Remaining Bad Faith Allegations are Conclusory

Finally, Plaintiff's remaining allegations cannot support a statutory bad faith claim because they are conclusory.  For example, Plaintiff alleges Landmark engaged in bad faith through the following actions:  (1) breaching the implied covenant of good faith and fair dealing; (2) violating the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et seq.; (3) wantonly and willfully disregarding the rights of Bengal; (4) acting in bad faith in the handling of the claims of Bengal; (5) breaching the fiduciary duties owed to Bengal under the Landmark Policy; (6) violating the Unfair Claims Settlement Practices, 31 Pa. Code § 146.1 et seq.; (7) violating statutes and regulations in the

Commonwealth of Pennsylvania governing insurers; and (8) violating its own internal policies, procedures, practices and guidelines for handling of claims.  (Doc. No. 1-3 at ¶¶ 230 (i), (k), (n), (u)-(y).)

Plaintiff alleges no facts to support these allegations.  If anything, these allegations are, as above, contradicted by the facts in the Complaint and the Interpleader Action docket which detail how Landmark (1) promptly investigated and made payments towards Plaintiff's claim for property damage coverage, (2) had a reasonable basis for denying Plaintiff's claim for business income and extra expense coverage, (3) deposited the undisputed insurance proceeds into the Registry of the Court rather than withholding them throughout the Interpleader Action, and (4) permissibly attempted to be released from liability for all claims that Plaintiff might have against it relating to the fire loss.  (See generally id.)  Without supporting facts, Plaintiff's bad faith allegations are conclusory and, at the Motion to Dismiss stage, cannot serve as the basis for its statutory bad faith claim.

Accordingly, because Plaintiff's allegations do not support a statutory bad faith claim, this claim as alleged in Count V will be dismissed.  However, the claim will be dismissed without prejudice.  In the event Plaintiff believes that discovery has revealed evidence of Landmark's bad faith, Plaintiff may seek to amend the Complaint and to allege this claim again.

### B.    Landmark's Motion to Strike Will Be Denied as Moot

In its common law and statutory bad faith claims, Plaintiff alleges that Landmark breached its fiduciary duties owed to Plaintiff under the Landmark Policy.  (See Doc. No. 1-3 at ¶¶ 220 (v), 230 (w).)  Landmark moves to strike these allegations, claiming that the Landmark Policy did not give rise to a fiduciary relationship between Landmark and Plaintiff.  (See Doc. No. 7 at 17-20.)  But because these allegations arise under Plaintiff's common law and statutory bad faith claims

and the Court concluded, <u>supra</u>, that it will dismiss these claims, Landmark's Motion to Strike will be denied as moot.

## V.    CONCLUSION

For the foregoing reasons, Defendant Landmark American Insurance Company's Motion to Dismiss and Strike the Complaint (Doc. No. 7) will be granted in part and denied in part.  An appropriate Order follows.